UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AMAR AL HAJAMI,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No.  4:12CV2252 TIA
                                         )
CAROLYN W. COLVIN, Commissioner          )
of Social Security,                      )
                                         )
                    Defendant.           )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

    This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Disability Insurance Benefits under Title II of the Social

Security Act.  Claimant has filed a Brief in Support of his Complaint; the Commissioner has

filed a Brief in Support of her Answer. The parties consented to the jurisdiction of the

undersigned pursuant to 28 U.S.C. § 636(c).

I.    **Procedural History**

    On December 7, 2009, Claimant filed an Application for Disability Insurance Benefits

under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 180-66)[1] alleging disability since

September 20, 2009 [2] due to residuals of neck injury, severe neck pain and immobility, residuals

of two surgeries to neck and vocal cords, inability to bend, sit or stand for prolonged periods,

anxiety, and shoulder problems.  (Tr. 85).  The application was denied  (Tr. 85-89), and Claimant

---

    [1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 11/filed April 26, 2013).

    [2]At the hearing, Claimant though his attorney amended his alleged onset date of disability
from January 1, 2008, to April 30, 2010.  (Tr. 32-34).

subsequently requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 95-96).  On

July 25, 2011 a hearing was held before an ALJ.  (Tr. 28-80).  Claimant testified and was

represented by counsel.  (Id.).  Dr. Anne Winkler, the medical expert, and Vocational Expert

John McGowan also testified at the hearing.  (Tr. ).  (Tr. 33-56, 69-78).  In a decision dated

August 26, 2011, the ALJ found that Claimant had not been under a disability as defined by the

Social Security Act.  (Tr. 8-22).  After considering the vocational analysis, Dr. Musich's report,

and the Mental Residual Functional Capacity Questionnaire, the Appeals Council denied

Claimant's Request for Review on October 17, 2012.  (Tr. 1-5, 597-602, 752-84, 786-90, 793-

98).  Thus, the ALJ's decision is the final decision of the Commissioner.

II.     **Evidence Before the ALJ**

        **A.  Hearing on July 25, 2011**

        At the hearing on July 25, 2011, Claimant testified in response to questions posed by the

ALJ and counsel.  (Tr. 56-68).  His date of birth is November 26, 1969, and at the time of the

hearing, he was forty-one years old.  (Tr. 56).  Claimant stands at five feet seven inches and

weighs approximately 197 pounds.  (Tr. 56, 787).  He completed middle school in Iraq and

moved to the United States in 1996.  (Tr. 57).  He has never studied English.  (Tr. 57).  Claimant

is a citizen of the United States and took the citizenship test in English.  (Tr. 58).  Claimant

explained that Dr. Musich's notation finding he has a good command of English could have been

directed to his wife who also was present during his assessment.  (Tr. 59).  Although he has a

driver's license, Claimant testified that he seldom drives.  (Tr. 64).

        Claimant worked for Host International, Incorporated from 1996-98 washing dishes in

the restaurant.  (Tr. 60).  He did not have to speak English, because he worked with a group of

Iraqis so they spoke Arabic to one another. A friend interpreted to the supervisor for him. He worked for Harris Company washing dishes by hand. (Tr. 60). From 2002-2009, he worked at a company taking out the trash and packing books in boxes. (Tr. 61).

Claimant testified that he experiences pain in his arms 24 hours a day since September 20, 2009. (Tr. 62). If he carries a bottle of water for more than two minutes. he experiences pain. Claimant testified that he cannot stand for a long time. (Tr. 63). He can walk for ten to fifteen minutes. (Tr. 63).

His daily activities include staying at home and watching television. (Tr. 63). He stopped doing yard work before his first surgery. (Tr. 63). After his first surgery in 2007, he became depressed because he could not help his wife around the house or contribute to his family. (Tr. 65). Claimant testified that he has not had insurance since 2009. He was denied Medicaid because of his wife's income. (Tr. 65). His wife works from 8:00 in the morning until 4:00 in the afternoon. (Tr. 66). His wife drops off their infant and daycare, and he drives the other two children to school. (Tr. 66).

Claimant testified that he experiences numbness in his fingers. (Tr. 67). After his first surgery, he had blockage in his throat so he is not able to talk for a long period of time. (Tr. 68).

### 2. Testimony of Medical Expert

Medical Expert Dr. Anne Winkler testified in response to the ALJ's questions. (Tr. 33-56, 165-71, 742-48). Dr. Winkler listed cervical degenerative disease per surgery, vocal cord simulator because of a paralyzed vocal cord related to his cervical surgery, chronic obstructive lung disease with a low diffusion capacity, overuse of narcotics, cubital tunnel syndrome, migraine headaches, and chronic back pain as Claimant's medical impairments. (Tr. 34-35). Dr.

Winkler opined that his impairments would not meet the findings required by any one listing of impairments or in combination. (Tr. 35). Based on the documentary evidence especially the medical records, Dr. Winkler found Claimant would be able to lift/carry twenty pounds occasionally, ten pounds frequently, and stand/walk six hours in an eight hour workday with no limitations on sitting. (Tr. 36). His postural limitations would include occasional stairs, no ladders, ropes, or scaffolding, frequent balance, kneel, crouch, stoop, and bend but no crawling. Dr. Winkler found he could never reach overhead but otherwise he could frequently reach, finger, feel, and handle. He has no visual or communicative limitations. (Tr. 36). His environmental limitations would include no unprotected heights; moderate or less exposure to dust, fumes, odors, or gases; and avoid concentrated exposure to cold wetness and humidity. (Tr. 37).

Dr. Winkler testified she found Dr. Wilkey the orthopedic surgeon who performed the two surgical fusions, to be persuasive on documentation of impairments and the orthopedist's assessment. (Tr. 37). The ALJ noted the difference of opinion between Dr. Wilkey and Dr. Musich, an independent medical examiner. Although Dr. Musich included some restrictions relating to no driving or operating commercial vehicles, Dr. Winkler opined that the documentary evidence did not support such limitations inasmuch as Claimant did not have any additional trauma to his spine after December 26, 2006 after the surgery. Dr. Winkler noted that Dr. Musich failed to note the normal imaging results and opined that she was a little surprised by some of his limitations. (Tr. 37). The ALJ noted how Dr. Musich included a limitation to basically look straight ahead, and Dr. Winkler opined nothing in the medical records suggested that there would be such a limited range of motion that he would not be able use his neck. (Tr.

38). Dr. Winkler opined that the medical evidence did not warrant the finding that he could not tilt his head downward to look at a keyboard, desk, or bench. (Tr. 38). Although he has some decreased range of motion, Dr. Winkler did not see support in the record support showing he could not look with his eyes downward and his neck titled. Dr. Winkler found the record supported some decreased range of motion turning his head side to side. (Tr. 39).

Dr. Winkler testified she could not confirm the presence of cubital syndrome or medial epicondylitis, because there is no physical examination or EMG testing but only a potential diagnosis. (Tr. 40). Dr. Winkler explained cubital tunnel syndrome is initially treated conservatively with NSAIDs and an elbow pad if it does not resolve in surgery so she believed it would not normally be an impairment lasting twelve months or longer. (Tr. 41).

Dr. Winkler testified that there were references in the medical records noting concerns that Claimant was still taking narcotics at a time when it would not be expected, because the narcotics were for post-surgical pain. (Tr.42). She further explained how some treating doctors felt that Claimant's demeanor seemed excessive in terms of exaggerating his symptoms, such symptoms would not normally require any narcotics but Claimant was still requesting the narcotics be prescribed. For example, Dr. Winkler cited how Dr. Shelton released Claimant from his care because testing had shown hydrocodone and skelaxin, and Dr. Shelton had been prescribing percocet. (Tr. 42). Dr. Winkler explained how percocet is oxycodone and considered a stronger narcotic than hydrocodone, and Claimant should only have one physician in charge of prescribing narcotics at a time. (Tr. 43). She opined that when the urine drug test revealed percocet there should not have been hydrocodone as well. The results of the urine drug test suggested there might be an issue with the use of narcotics, and so Dr. Shelton suggested

there was not an appropriate following of the narcotics contract as required. (Tr. 43). Dr. Shelton testified that Skelaxin is a muscle relaxer and ordinarily is not sedating for the person taking it. (Tr. 43).

In response to counsel's question about the limitations he has from his COPD and moderately reduced breathing, Dr. Winkler not light activity so lifting, carrying, and standing as well as exposure to the elements such as cold, wet, and humidity, and fumes. (Tr. 45). Dr. Winkler explained how Claimant had signed a narcotic contract so Dr. Shelton felt that Claimant was taking medications he had not prescribed so Claimant was fired contractually because of lack of compliance. (Tr. 46). Dr. Winkler testified that oxycodone can cause drowsiness and is rarely used with medial epicondylitis ro cubital tunnel syndrome. (Tr. 47). She further testified that there is no evidence indicating Claimant had such side effects from narcotic pain medications. (Tr. 46-47).

With respect to Dr. Musich's finding Claimant cannot do cervical positioning for a prolonged period of time, Dr. Winkler indicated this finding to be a little surprising inasmuch as Dr. Wilkey's 2010 assessment did not show any significant decrease in range of motion. (Tr. 48). She explained that is why she felt there could be some neck mobility and would not expect somebody with neck surgery to be so limited that he would not be able to bend, tilt, and rotate his neck at least fifty percent on a prolonged basis. (Tr. 49). Dr. Winkler noted how Dr. Wilkey, the treating surgeon did not indicate a decreased range of motion and muscle spasms but instead found a much improved range of motion. (Tr. 50). Dr. Winkler explained how range of motion is somewhat subjective depending on patient cooperation. She explained how muscle spasms show the muscle is sore and tight. (Tr. 50). Dr. Winkler opined muscle spasms would not

interfere with Claimant's ability to look down for long periods.  (Tr. 51).  Dr. Winkler noted how

Dr. Wilkey found in his assessment that Claimant could do light duty.  (Tr. 53).

### 3.  Testimony of Vocational Expert

Vocational Expert Dr. John McGowan, a retired vocational counselor, testified in

response to the ALJ's questions.  (Tr. 69-78, 162-63).  Dr. McGowan described Claimant's work

background over the past fifteen years as including four laborer jobs and two dishwasher jobs.

(Tr. 71).  Dr. McGowan noted that one the documents contains a good job description of the

large baling machine operator job.  (Tr. 71).  Dr. McGowan cited the dishwasher job at the

medium exertional level as having transferrable skills; the large mangling machine operator at

the heavy exertional level and unskilled; industrial truck operator/forklift operator or hi/lo

operator with no transferability of skills.  (Tr. 72).

The ALJ asked Dr. McGowan to assume

> a hypothetical person who is age 41 and who is illiterate in English and cannot
> speak English.  I'd like you to assume a person with a work background you've
> just identified.  Please assume that person is limited to light work not requiring
> lifting/carrying more than 20 pounds.  That person should not climb ladders,
> ropes or scaffolding ... no reaching overhead.  Could such a person perform any
> kind of work that exists throughout the national economy and in the region of
> Missouri and in the St. Louis Metropolitan statistical area?

(Tr. 72-2).  Dr. McGowan responded he has no transferability from the vocational point of view.

Dr. McGowan cited unskilled jobs at the light exertional level inasmuch as such jobs do not have

a requirement of speaking.  (Tr. 73-74).  Dr. McGowan listed a hospital products assembler,

plastic materials with 450 jobs in the metropolitan area and 26,400 nationally, small parts

assembler with 1,850 in the metropolitan area and 345,000 nationally, and plastic products

inspector/hand packager with 900 in the metropolitan area and 76,650 nationally.  (Tr. 74).

The ALJ next asked Dr. McGowan to assume "that the person cannot perform any work requiring tilting the head upwards or downwards or rotating the head to the side?" Dr. McGowan opined such limitation would preclude a person from being able to perform the jobs he cited. (Tr. 74). The ALJ asked if a person could perform any jobs just by looking straight ahead based on Dr. Musich's finding. (Tr. 75). Dr. McGowan opined that he did not know of any job a person could perform with such limitation. (Tr. 75).

Next, the ALJ asked Dr. McGowan to assume the same hypothetical person but adding the following:

> the person can lift and carry up to 20 pounds occasionally and 10 pounds frequently. The person can stand and walk six hours total of an eight-hour workday and there's no limit on sitting. The person can occasionally climb stairs. That person should never climb ropes, ladders or scaffolding.
>
> The person can frequently balance, kneel, stoop and crouch. The person should never crawl and the person should never reach overhead. The person also should not work at unprotected heights and that person is limited to work at unprotected heights and that person is limited to work with moderate exposure to dust, fumes, odors, and gases.
>
> The person cannot have concentrated exposure to cold, wet or humidity. If you assume all of those things, can such a person perform any kind of work that exists throughout the national economy and in Missouri and in the St. Louis Metropolitan statistical area?

(Tr. 75-76). Dr. McGowan questioned if this hypothetical was substantially different that the first one except for going into more detail so his answer would remain the same. (Tr. 76).

The ALJ asked for Dr. McGowan to assume the same individual as the previous question but adding the following:

> The person is limited to light work, no climbing ladders, ropes, scaffolds, no reaching overhead. Assume that the person has difficulty grasping objects because of numbness in two fingers on each hand and has problems manipulating objects and grasping objects. Can such a person perform any kind of work that

- 8 -

exists in the national economy?
(Tr. 76).  Dr. McGowan responded no inasmuch as to perform sedentary work, an individual must have good use of his hands.  (Tr. 76).  He explained that all of the work administratively noticed and commonly done in the national economy as light work involves manipulation with both hands.  (Tr. 77).  Although Dr. McGowan testified that such individual could not work as a small parts assembler with that limitation, he still believed that such individual could work as a parking lot attendant inasmuch as such job does not require grasping and the use of hands.  (Tr. 77).  Dr. McGowan noted how there are 180 jobs in the metropolitan area and 13,700 nationally. (Tr. 78).

### 4.  Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported working as a laborer from April 2002 through September 2009 five days a week, eight hours a day.  (Tr. 233).  He responded no to the question asking if he had received treatment from a doctor or other health professional for any mental condition.  (Tr. 235).

In the Work History Report, Claimant reported working as a laborer/machine operator from April 2002 through December 2009 six days week, eight hours a day.  (Tr. 242-43).

## III.    Medical Records

On July 19, 2007, Dr. James Hartman performed right true vocal medialization to treat Claimant's right true vocal cord fold paralysis resulting in dysphonia.  (Tr. 413-27, 461-62). Claimant returned for follow-up treatment on July 25 and August 20, 2007.  (Tr. 453-55).

On March 1, 2007, Dr. Keith Wilkey evaluated Claimant for a herniated disc and left shoulder and radicular arm pain on referral.  (Tr. 526).  The x-ray showed some mild to moderate cervical spondylosis at C6-7.  (TR. 527).  The MRI showed a left sided herniated disc at C5-6

which is moderate in size and impinging on the nerve root at C7. (Tr. 527). Dr. Wilkey recommended proceeding with cervical epidural injections and placed him on limited duty work status. (Tr. 528). Claimant returned on March 15, 2007 after having his cervical epidural steroid injection and reported his left radicular pain had improved slightly and the numbness had improved. (Tr. 542-43, 529). Examination showed a full range of motion but painful rotation and extension to the right. Claimant reported being miserable and wanting surgical treatment. Dr. Wilkey prescribed Vicodin for pain and placed him on light work duty of lifting no more than twenty pounds and no overhead work. (Tr. 529).

On April 5, 2007, Dr. Wilkey performed anterior cervical diskectomy with decompression of nerve roots and spinal cord, structural allografting spinal, and anterior cervical plating. (Tr. 543-46). Claimant returned for follow-up treatment after cervical discectomy on April 17 and reported still has some occasional left arm pain but much improvement. (Tr. 530). Examination showed excellent range of motion to the neck. (Tr. 530). On May 1, Dr. Wilkey found almost all of his arm symptoms to be resolved. (Tr. 531). On May 24, Dr. Wilkey found Claimant could go back to some type of duty that is not a noisy work environment where he would not be heard if there was a problem. (Tr. 532). On July 31, 2007, Dr. Wilkey found his symptoms to be markedly improved, and he has full range of motion in his neck, and his voice has returned to normal. (Tr. 535). Dr. Wilkey discharged him to work at full duty with no restrictions given. (Tr. 535).

On July 28, 2007, Claimant sought treatment in the emergency room at St. John's Mercy Medical Center for facial swelling. (Tr. 431-50). He was diagnosed with an allergic reaction and prescribed Prednisone, Tylenol with Codeine, and Pepcid. (Tr. 439-44).

Dr. Sam Hawatmeh treated Claimant from February 19, 2008 through March 23, 2010 for shoulder and neck pain. (Tr. 334-66). On January 22, 2009, Claimant requested a refill fo r Oxycodone for back pain, but Dr. Hawatmeh would not provide a refill inasmuch refill had been given on January 13, 2009 for thirty tablets. (Tr. 340).

The January 3, 2008 CT scan of his cervical spine showed anterior plate to be in good position, minute bulging discs in cervical region, no spinal stenosis, and no acute fractures. (Tr. 554). The CT of his neck showed minimal findings. (Tr. 555).

On February 7, 2008, Dr. Wilkey treated Claimant nearly a year after his cervical decompression and fusion. (Tr. 539). Claimant reported still experiencing pain especially when he does any kind of lifting or physical activity. Examination showed a full range of motion of the neck and 5/5 muscle strength. The x-ray showed excellent integration of the graft and no change in hardware placement. A surveillance video showed Claimant able to bend and move around fully and providing childcare for his children. Dr. Wilkey opined this video clearly demonstrates a full range of motion and his ability to perform at least activities of daily living without any problems. (Tr. 539).

The March 3, 2008, MRI of his cervical spine showed minimal disc bulging at C3-4, C4-5, and C5-6, C6-7 anterior discectomy and interbody fusion, and no evidence of spinal stenosis, cord impingement, cord compression, or disc herniation. (Tr. 553).

In follow-up treatment on July 31, 2008, Claimant reported the onset of left arm symptoms associated with work activity. (Tr. 540). Dr. Wilkey noted that Claimant had been able to return to work for about seven months and has had minimal problems by his report until this activity. Examination showed a full range of motion and improved since his last visit and a

5/5 muscle strength. The x-ray showed the previous fusion level at C6-7 entirely incorporated with bridging bone and no signs of radiolucencies consistent with a nonunion. Dr. Wilkey opined as follows: "As noted by his own history, he has been able to return to work without difficulty and has been relatively asymptomatic for several months. He has been taking narcotics. I did not see the reason for this, but this seemed to have helped him." Dr. Wilkey found that he has developed the onset of left arm pain again, but this is clearly not related to his previous episode." Dr. Wilkey referred him back to his primary care physician and found nonsteroidal medication and observation and guarded rest should be all that is necessary to treat this problem. (Tr. 540).

The August 1, 2008 x-ray of his cervical spine demonstrated evidence of previous anterior cervical discectomy and fusion and C6 and C7 with a plate with the plate in a good position. (Tr. 285).

In the August 19, 2008 letter, Dr. Crane explained how he treated Claimant for acute onset of neck and left arm pain following a work-related injury on July 25, 2008. (Tr. 280, 375). Dr. Crane listed cervical radiculopathy as a result of a work-related injury and pseudoarthritis of C6 and C7 as his diagnosis. (Tr. 282, 377). Dr. Crane placed Claimant on light duty limiting his lifting to no more than ten pounds, no overhead lifting, no pushing, pulling, bending or stretching. Dr. Crane prescribed Naprosyn and physical therapy. (Tr. 282, 377). Dr. Crane placed work limitations including no overhead work, no bending, pushing, or lifting over ten pounds. (Tr. 291). Dr. Crane prescribed physical therapy two to three times a week as treatment. (Tr. 296).

The August 15, 2008 x-ray of his shoulder showed no fracture or dislocation. (Tr. 551).

The x-ray showed normal left shoulder.  (Tr. 552).

On September 9, 2008, Dr. Benjamin Crane noted Claimant could not undergo a MRI of his cervical spine, because he has a vocal cord stimulator implant so he ordered a CT myelogram of his cervical spine.  (Tr. 279, 374).  Dr. Crane noted Claimant has been given a prescription for physical therapy, but he did not participate as prescribed, because physical therapy had not helped him the last time, and he was not interested in trying  (Tr. 278, 373).  He explained his neck pain with radiating pain into his left shoulder made worse by activities.  Physical examination showed his motor strength in the upper extremities still to be 5/5.  His major concern is his neck and shoulder pain, and he stated he could deal with hand numbness that occurs only at night.  Dr. Crane discussed with him at length that he needs to quit smoking before he could perform a fusion operation on his neck, and Claimant indicated that he was in agreement.  (Tr. 278, 373).  Dr. Crane imposed the same work limitations.  (Tr. 292).  On September 12, Claimant complained of pain in a phone call and requested analgesic, and Dr. Crane prescribed Darvocet.  (Tr. 278).  He returned on September 22 after having a MRI which showed maintained cervical lordosis and a slight disc bulge at the C5-C6 level causing left paracentral stenosis of the left foramine.  (Tr. 277).  Dr. Crane referred him to Dr. L'Hommedieu for evaluation of his shoulder .  (Tr. 277).

The September 18, 2008 MRI of his cervical spine showed post-op changes with anterior decompression and fusion at C6-C7, minor disc/spur complexes at C4-5, C5-6, and C6-7 with no central canal or foraminal stenosis.  (Tr. 286).

The September 30, 2008 nerve conduction study no evidence of focal median, ulnar, or superficial radial nerve neuropathy in bilateral upper extremities and no evidence of cervical

radiculopathy.  (Tr. 288-90).

In follow-up treatment on October 3, 2008,  Dr. L'Hommedieu's examination showed minimal impingement and strength around shoulder to be excellent.  (Tr. 276).  The radiographic examination of his bilateral shoulders showed type II acromion bilaterally but otherwise no significant degenerative changes.   Dr. L'Hommedieu diagnosed him with bilateral rhomboid strain and shoulder pain.  (Tr. 276).  He refused a diagnostic injection and physical therapy.  (Tr. 277).  Dr. L'Hommedieu provided a single refill for Darvocet.  (Tr. 277).   Dr. L'Hommedieu imposed work limitations including no lifting more than ten pounds with bilateral upper extremities for three weeks.  (Tr. 293).

On October 16, Claimant complained of increasing shoulder pain and noted that his personal physician has prescribed oxycodone which has improved his symptoms.  (Tr. 275).  Examination showed some pain around the shoulders.  (Tr. 275).  Dr. L'Hommedieu  explained to him that the majority of his symptoms are likely related to the extraarticular shoulder and unrelated to the subacromial region.  (Tr. 276).  Dr. L'Hommedieu performed an injection as treatment.  (Tr. 276).  The x-ray of his shoulders showed type II actromion bilaterally but otherwise no significant degenerative changes.  (Tr. 284).   Dr. L'Hommedieu imposed a work limitation of no lifting more than ten pounds with bilateral upper extremities..  (Tr. 295).  On October 30, he reported mild improvement but still experiencing pain.  (Tr. 275).

On December 11, 2008, Claimant returned and reported no improvement in his shoulder since last visit.   (Tr. 274).   Dr. L'Hommedieu opined that he could rule out significant shoulder dysfunction as the cause of his pain.  (Tr. 275).

On December 22, 2008, Claimant failed to show up for a colonoscopy due to GI bleeding

scheduled at St. Louis Gastroenterology Associates on referral by Dr. Hawatmeh. (Tr. 371-72).

The December 22, 2008 examination showed Claimant not to have any significant tenderness to palpation and able to look up at the ceiling and look over both shoulders. (Tr. 274). Dr. Crane made the diagnosis of cervical radiculopathy and discussed his uncertainty regarding whether any surgical procedure would alleviate his neck and arm symptoms. Dr. Crane discussed with him his hesitancy in performing surgery because his smoking causes a risk of developing a non-union following surgery. (Tr. 274). The x-ray of his cervical spine showed hardware not loosening and no significant anterior or posterior osteophytes. (Tr. 283).

In the initial visit on February 21, 2009, Claimant reported significant neck pain and difficulties with his voice. (Tr. 299, 368). He is a fifteen year smoker and takes OxyContin on a regular basis. Dr. Jose Lima found Claimant to have a paralyzed right vocal cord as a result of his neck surgery and diagnosed him with bronchitis and noted his excessive tobacco use. Dr. Lima recommended smoking cessation. (Tr. 299, 368). On March 11, he returned for voice fatigue treatment. (Tr. 298). Dr. Lima explained how there is no significant therapy for voice fatigue and recommended seeing a voice therapist if he condition worsens. Dr. Lima also recommended Claimant call Dr. Abdeem and request referral to a pulmonary specialist inasmuch as he has significant COPD. (Tr. 298).

Dr. Keith Wilkey completed an independent medical evaluation on May 12, 2009. (Tr. 320). Claimant reported continued nonfocal shoulder and neck pain and not being able to do any lifting above his head. Examination showed a full range of motion in his neck. The x-rays of his neck showed excellent placement of the hardware , and the interbody fusion appeared to be completely healed. The MRI study showed no evidence of residual stenosis in any area. (Tr.

320).  In the assessment, Dr. Wilkey ruled out nonunion and noted persistent somatic complaints

etiology unclear.  (Tr. 321).  Dr. Wilkey noted that in 2007 when Claimant was released to return

to work, he refused to do several lifting activities and his effort was poor.  Dr. Wilkey opined

that there is no objective evidence of any abnormality or any reason to restrict his activities.  Dr.

Wilkey opined that at the current time, he has no objective evidence that Claimant needs

temporary or permanent work restrictions and he can work safely at full duty without restriction.

(Tr. 321).  Dr. Wilkey noted that he had in the past found Claimant to be a maximum medical

improvement.  (Tr. 322).  In follow-up treatment on June 16, examination showed guarding with

range of motion but a full range of motion.  The CT scan showed probable nonunion.  Dr.

Wilkey found Claimant has the potential for a nonunion and noted he is still symptomatic with

neck and arm pain.  Dr. Wilkey opined that his continued smoking most likely led to his

nonunion and discussed the possibility of performing a posterior fusion and decompression of

nerve roots but only if Claimant stops smoking and allows six to twelve weeks without nicotine.

(Tr. 322).

On July 14, 2009, Claimant requested Dr. Wilkey keep him off work and reported

continued but reduced smoking.  (Tr. 323).  Examination showed a full range of motion of his

neck.  Dr. Wilkey diagnosed him with nonunion cervical fusion and made an oral contract with

Claimant regarding smoking cessation.  (Tr. 323).  On August 14, Claimant made multiple

complaints about his employer not following restrictions and reported continued smoking.  (Tr.

324).  Dr. Wilkey had a prolonged discussion regarding smoking cessation, and the only way to

get his neck fixed is to stop smoking.  (Tr. 324).  Dr. Wilkey released Claimant to work with the

same restrictions and reminded him he had to quit smoking before he would proceed with

surgery. (Tr. 325). Dr. Wilkey opined that his smoking is a significant factor in the nonunion of his cervical fusion. (Tr. 325).

On December 11, 2009, Dr. Keith Wilkey performed decompression and fusion C6-7 and arthrodesis at C6-7. (Tr. 308-17). In follow-up treatment on December 29, Dr. Wilkey noted his range of motion is limited secondary to pain. (Tr. 326). The x-ray showed good placement of the hardware and graft. (Tr. 326). Dr. Wilkey ordered Claimant to stay off work until he starts to heal and prescribed a Percocet refill. (Tr. 327).

On February 11, 2010, examination showed a guarded full range of motion of his neck. (Tr. 327). Dr. Wilkey found Claimant needed to get involved in an aggressive therapy program, prescribed Hydrocodone for pain, and noted he could return to at least limited duty within six to twelve weeks. (Tr. 327).

In follow-up treatment on March 4, 2010, Dr. Wilkey found Claimant to be ready to advance to light duty and noted he has "multiple complaints as always." (Tr. 328). Examination showed his neck to be stiff and a full range of motion. Dr. Wilkey limited his lifting and carrying to twenty pounds, and overhead work and climbing as tolerated and prescribed a refill of Hydrocodone. (Tr. 328).

On April 8, 2010, Dr. Wilkey noted how Claimant has called the office several times requesting an increase dosage in his pain medications. (Tr.384). Dr. Wilkey would not comply with his requests and noted his complaints remain the same, and his wife is requesting a note for welfare. Examination showed no difficulty moving his neck. Dr. Wilkey opined how Claimant needed to get off his pain medicine. Dr. Wilkey made a referral to a pain management physician for chronic pain management and ordered a CT scan to ensure the area is fused. Dr. Wilkey

prescribed Vicodin limited to six tablets a day.

The June 11, 2009 CT of his cervical spine showed anterior plate and interbody graft at C6-7 incorporated into C7 but not definitely fused at C6.  (Tr. 329).

In the June 14, 2010 Psychiatric Review Technique, Dr. Robert Cottone noted that there is no current, established MDI for anxiety.   (Tr. 393-403).  Dr. Cottone found the overall evidence is not supportive for ongoing symptoms related to alleged anxiety.  (Tr. 403).

On September 2, 2010, Claimant reported neck pain and left arm pain.  (Tr. 410).

On September 21, 2010, Dr. Wilkey found Claimant to be at maximum medical improvement.  (Tr. 409).  Dr. Wilkey noted how he failed a drug test and "he was noted to have Hydrocodone and Skelaxin and not the Percocet that Dr. Shelton had prescribed.  Dr. Shelton was attempting to wean on his medication and Amar violated the contract and thus he has been fired. He continues to smoke."  (Tr. 410).  Dr. Wilkey noted a recent CT scan showed healing of the facet fusion, and fusion appears to be solid, and the anterior surgery remains a nonunion.  He listed in the assessment healed posterior cervical fusion.  Dr. Wilkey found Claimant to be at maximum medical improvement. Dr. Wilkey noted how Claimant had been fired from Dr. Shelton's pain management treatment and recommended weaning him off of narcotic medications.  (Tr. 410).  In the work/activity release, Dr. Wilkey to be restricted in climbing and overhead work as tolerated and no lifting/carrying more than twenty pounds.  (Tr. 411).

On September 22, 2010, Claimant sought treatment at Smiley Urgent Care Center fo chronic pain syndrome and generalized pain following disc surgery in neck.  (Tr. 719, 741).  His chief complaint was out of pain medications.  (Tr. 716).  Dr. Taxman noted how Claimant reported not having a primary care physician, but he has a prescription for Oxycodone which

was written by a primary care physician last month.  (Tr. 716).  Dr. Taxman observed how he was rocking and moaning dramatically, but he declined analgesic injection.  (Tr. 717).  Dr. Taxman found based on Claimant's dramatic demeanor and certain inconsistencies in his medical history to be suggestive of drug seeking behavior.  Dr. Taxman noted the nurse could provide him a list of clinics where he could receive treatment even without good health insurance.  (Tr. 717).  Dr. Taxman prescribed Tramadol tablets for seven days as treatment and refused to prescribe pain medication.  (Tr. 717, 719, 741).  He reported smoking cigarettes.  (Tr. 718).

On October 14, 2010, Claimant presented at Grace Hill complaining of neck and arm pain starting a month earlier.  (Tr. 641).  Examination showed posterior tenderness of his spine.  (Tr. 642).  On October 22, Claimant returned complaining of neck pain.  (Tr. 639).  He requested a Percocet refill.  (Tr. 639).  Examination showed a normal range of motion, and palpation to the neck revealed tenderness.  The Grace Hill doctor prescribed Vicodin.  (Tr. 640).

In a follow-up treatment on November 11, 2010, Claimant reported neck pain and right arm pain.  (Tr. 633, 726, 734).  Examination of his back/spine showed tenderness.  (Tr. 634, 727, 734).  Dr. Tonya Little found Claimant to have decreased active range of motion with limiting factors of pain in his right shoulder.  Dr. Little ordered an x-ray of his cervical spine and prescribed Percocet.  (Tr. 634, 727, 735).  The right shoulder x-ray showed normal results.  (Tr. 632).  The cervical x-ray showed lower cervical fixation device and right cervical rib.  (Tr. 632).  On December 2, Claimant reported right arm pain to be improving, and pain to be relieved by pain medications.  (Tr. 626, 729).  Examination showed tenderness to his back/spine.  (Tr. 627, 730, 737).  Dr. Little observed decreased active range of motion with limiting factors of pain of

his right shoulder. (Tr. 627, 730, 737). Dr. Little made a referral to an orthopedic for neck, shoulder, and arm troubles. (Tr. 629). Claimant reported doing well on Prednisone and only needed to take two Percocet daily when he returned on December 22. (Tr. 622). Dr. Little continued the Prednisone regimen for three weeks but noted he could not be able to use for several months thereafter due to potential side effects. (Tr. 625).

In the January 11, 2011 letter, Dr. Thomas Musich reported his findings based on an independent medical evaluation for purposes of a worker's compensation claim as requested by Thomas Fagan. (Tr. 597). Claimant reported constant neck and arm pain and weakness of both upper extremities. (Tr. 599). He reported lifting, sitting, driving, or standing for any length to time over twenty minutes produces aggravated pain to his neck, upper back, and arms. He also complains of numbness and tingling over the dorsal ulnar aspect of both upper extremities associated with diminished cervical motion. Dr. Musich noted Claimant "demonstrates good command of the verbal English language." (Tr. 599). Cervical examination showed loss of fifty percent anterior flexion, loss of sixty percent posterior cervical flexion, and loss of fifty percent of cervical rotation and lateral flexion bilaterally. (Tr. 600). In the impression, Dr. Musich opined Claimant has a permanent partial disability of seventy percent of the man and five percent of the left shoulder. (Tr. 601). Dr. Musich further opined Claimant should observe the permanent restrictions placed upon him by Dr. Wilkey, and he should refrain from driving or operating any commercial vehicles. He should further refrain from any activities that prolonged cervical positioning, cervical rotation, or any lifting over twenty pounds. (Tr. 601). Dr. Musich concluded by finding "[i]f vocational rehabilitation is unable to place [Claimant] in a full time job which can accommodate the above recommendations, then it would be my medical opinion

that this patient is totally and permanently disabled as a result of the work trauma and subsequent symptomatology referable to the work incident from December 26, 2006." (Tr. 602).

From March 1 through April 20, 2011, Claimant received treatment on twenty days at Blalock Chiropractic Centre after a motor vehicle accident on February 21, 2011. (Tr. 679-704). He reported having bilateral posterior neck pain, posterior left shoulder pain, and bilateral lower back pain. (Tr. 679). Examination showed tenderness in the cervical region bilaterally and in the lumbar region bilaterally. (Tr. 681, 699-700). The x-ray of his cervical back showed no fractures, dislocations, or osseous blastic/lytic lesions, and the cervical lordosis to be within normal limits. The x-ray of his thoracic spine showed no fractures, dislocations, or osseous blastic/lytic lesions. The x-ray of his lumbar spine showed no fractures, dislocations, or osseous blastic/lytic lesions and to be within normal limits. (Tr. 681, 699-700). On April 20, he reported posterior neck, left shoulder, lower back and headaches continued unchanged since last visit and pain reduced by medication. (Tr. 697). He reported feeling better after his adjustment. (Tr. 698). Based on his report since his first visit, his symptoms have 100% improved, Dr. John Blalock decided to dismiss Claimant from treatment and directed him to continue therapeutic exercises at home. (Tr. 698).

On March 11, 2011, Dr. Little treated his right elbow and shoulder pain. (Tr. 620). Examination of his shoulder showed tenderness and scheduled an appointment with an orthopedist on April 10, 2011. (Tr. 621). Dr. Little prescribed Hydrocodone and Flexeril. (Tr. 621). On April 12, Claimant reported continued right arm pain. (Tr. 617). Dr. Little directed Claimant to stop Hydrocodone and resume Oxycodone. (Tr. 618). Claimant returned on April 30 reporting back pain with his symptoms relieved by pain medications. (Tr. 614). Examination

showed tenderness of his spine. (Tr. 615). On May 10, 2011, Claimant presented with back pain and neck/right arm pain. (Tr. 610). He reported trauma occurred due to a motor vehicle accident on March 1, 2011 and symptoms relieved by pain medications. The CT of his lumbosacral spine showed rather mild disc bulges L3-L4 and L4-L5 without extrusion or stenosis; conjoined nerve roots S1 and S2 on the right; a bony defect of the right illiium superiorly and posteriorly adjacent to the posterior aspect of the sacroiliac joint. Claimant also reported neck pain and right arm pain starting four months earlier with the pain being relieved by pain medications. Although an orthopedic surgeon diagnosed him with cubital tunnel syndrome and recommended surgery, he chose to wait until follow up on June 1, 2011 before deciding. (Tr. 610). Examination showed no vertebral tenderness and positive for posterior and bilateral lumbosacral tenderness. (Tr. 611). Dr. Little noted his cervical spine has tender, muscle spasm and moderately reduced range of motion. (Tr. 611). Dr. Little increased his Oxycodone dosage and prescribed Percocet as treatment and referred to an orthopedic for treatment of lumbago and follow up with orthopedist. (Tr. 611-12).

On April 18, 2011, Dr. David Kieffer prescribed Hydrocodone as treatment for cubital tunnel syndrome. (Tr. 713-14).

On April 27, 2011, Claimant reported elbow pain starting two days earlier while pull starting his power mower to a doctor at UrgentCare. (Tr. 708). He reported Hydrocodone with zero refills as his current medication and reported taking Vicodin and Motrin last night. Examination showed pain localized and with any range of motion of the right elbow. (Tr. 708). The doctor found Claimant to have causalgia of upper limb, provided an arm sling for comfort, and prescribed Tramadol. (Tr. 709-10).

In follow-up treatment on June 1, 2011, Dr. Kieffer treated his cubital tunnel. (Tr. 707). In past medical/surgical history, he reported physical trauma while playing a sport. Examination showed lumbar spine motion to be abnormal and pain elicited by motion. (Tr. 707).

In follow-up treatment on July 12, 2011, he reported having pain in joint involving his shoulder, and Dr. Little prescribed Oxycodone as needed and scheduled him for follow-up in four to six weeks. (Tr. 749).

Sherry Browning of Vocational Services completed a vocational analysis regarding Claimant's employment potential in July 2011 at request of counsel. (Tr.752-84). Ms. Browning found Claimant employable only in unskilled to semi skilled laboring jobs based on his education and work experience. (Tr. 780). Ms. Browning found he is unable to work in any capacity as a result of the December 2006 work injury following the April 2007 surgery. (Tr. 782). Ms. Browning opined his pain and functional limitations continue to the present. (Tr. 782).

On November 1, 2011, Dr. Musich reevaluated Claimant at counsel's request and noted he "reevaluated all the medical records identified in my initial IME report and obtained additional history from [Claimant]" and "there are no changes from that which is stated in my initial IME report of June 2008 and January 2011." (Tr. 786). Claimant reported "he has never undergone any additional evaluation or treatment relative to his cervical spine following January 2011." (Tr. 786). Examination showed pain to deep palpation over the paracervical musculature bilaterally and over the left parascapular musculature and noted decreased range of motion. (Tr. 788). Dr. Musich noted examination of his left shoulder to be unchanged from the June 2008 evaluation and full abduction, anterior flexion, and rotation, and no impingement identified. Dr.

Musich further observed straight leg raising to be negative bilaterally for low extremity radiculopathy. (Tr. 788). Dr. Musich opined that he should continue to observe Dr. Wilkey permanent restrictions and continue to follow with pain management. (Tr. 789). Dr. Musich found Claimant should refrain from driving or operating motor vehicles, and from activities that require prolonged cervical positioning, rotation, working above or below shoulder level, or lifting any weight greater than ten pounds. (Tr. 789). Dr. Musich further opined that Claimant should undergo vocational rehabilitation "to determine whether or not he is capable of obtaining and maintaining full time employment in the open labor market, given his recommended restrictions, his ongoing need for narcotics and analgesic medication and his frequent need for movement and rest on a daily basis." Dr. Musich concluded that if vocational rehabilitation would not place him in a job with such accommodations, the he would find he is totally and permanently disabled. (Tr. 790).

In the May 2, 2012 Mental Residual Functional Questionnaire completed by Dr. Luis Giuffra at the request of counsel, Dr. Giuffra found Claimant unable to meet competitive standards in almost all areas of mental abilities and aptitudes need to do unskilled work and semiskilled and skilled work. (Tr. 791-98). Dr. Giuffra opined Claimant is totally disabled for the foreseeable future, and the earliest date the description of limitation would apply would be seven years ago. (Tr. 797).

IV.     **The ALJ's Decision**

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 13). Claimant has not engaged in substantial gainful activity since September 20, 2009, the alleged onset date. The ALJ found that the medical

evidence establishes that Claimant had the following severe impairments: degenerative disc disease of the cervical spine with residuals of anterior cervical discectomy and fusion at C6-7 on April 5, 2007 and posterior decompression and fusion at C6-7 on December 11, 2009, and chronic obstructive pulmonary disease, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 13-14). The ALJ opined that Claimant has the residual functional capacity to perform less than a full range of light work. (Tr. 15). Claimant can lift up to twenty pounds occasionally and ten pounds frequently, and his sitting is not limited. The ALJ opined he can stand and walk a total of six hours out of an eight-hour workday; he can occasionally climb stairs or ramps, but he must never climb ladders, ropes, or scaffolds; and he can frequently balance, stoop, kneel, and crouch, but he must never crawl. The ALJ further limited him to never reaching overhead, and he must avoid moderate exposure to dust, fumes, odors, or gases; he must avoid concentrated exposure to cold, wet, and humidity, and he must avoid working at unprotected heights. (Tr. 15). Claimant is unable to perform any past relevant work since September 29, 2009 since he has had the residual functional capacity for less than the full range of light work. (Tr. 20-21).

The ALJ found Claimant was born on November 26, 1969, and was thirty-nine years old which is defined as a younger individual on the alleged disability onset date. (Tr.21). The ALJ noted Claimant is illiterate in English, and he cannot communicate in English. The ALJ noted that the transferability of job skills is not an issue because using the Medical-Vocational Rules supports a finding that Claimant is not disabled whether or not Claimant has transferable job skills. Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ opined there are jobs that exist in significant numbers in the national economy

that Claimant can perform such as a hospital products assembler, a small parts assembler, and a plastic products inspector/packager. (Tr. 21). The ALJ concluded that Claimant was not been under a disability from September 20, 2009, through the date of this decision. (Tr. 22).

**V.      Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.

If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  Id.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to pose a proper hypothetical question to the vocational expert. Next, Claimant contends that the ALJ that "absent information from the treating sources, it is not possible to ascertain Plaintiff's ability to work without engaging in medical conjecture."

A.      Hypothetical Question

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to pose a proper hypothetical question to the vocational expert. In particular, Claimant argues the vocational expert considered an improper hypothetical that allowed for moderate exposure to dust, fumes, odors, or gases. Claimant further contends that the ALJ posed an improperly formulated hypothetical question to the vocational expert by failing to include an additional limitation for a "50% reduction in neck mobility status-post cervical fusion."

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform. Pearsall, 274 F.3d at 1219. The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant.

The question must "precisely set out the claimant's particular physical and mental impairments." Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984). "'A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.'" Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005) (quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001)).  The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue or unsubstantiated.  Hunt 250 F.3d at 625; Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

An error in posing the hypothetical question may be harmless, however, if there is no conflict with the vocational expert's testimony and the DOT or there is no indication that the ALJ would have decided the case differently.  See VanVickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (ALJ harmless error where ALJ misread doctor's handwriting regarding whether claimant could "walk" or "work," because no indication that the ALJ's decision would have been different had he read the doctor's note correctly); Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (ALJ error in failing to ask vocational expert about possible conflicts between testimony and DOT harmless inasmuch as no conflict listed).

Assuming the vocational expert considered an improper hypothetical that allowed for moderate exposure to dusts, fumes, odors, or gases rather than jobs without even moderate exposure to dusts, fumes, odors, and gases, the result is inconsequential inasmuch as the omitted limitation was not present in the jobs identified by the vocational expert.  Two of the jobs identified by the vocational expert would not involve exposure to dusts, fumes, odors, or gases, and the other job involved less than moderate exposure to dusts, fumes, odors, or gases.  See

DOT 706.684-022, 1991 WL 679050 (small products assembler) (Atmospheric Cond.: Not present - Activity or condition does not exist); DOT 559.687-074, 1991 WL 683797 (inspector and hand packager) (Atmospheric Cond.: Not present - Activity or condition does not exist); DOT 712.687-010, 1991 WL 679245 (plastic hospital products assembler) (Atmospheric Cond.: Occasionally - Exists up to 1/3 of the time).

Claimant further contends that the ALJ posed an improperly formulated hypothetical question to the vocational expert by failing to include an additional limitation for a "50% reduction in neck mobility status-post cervical fusion." The undersigned finds that the medical record is devoid of any doctor finding or imposing such limitation nor does Claimant cite to any medical evidence supporting such limitation during the relevant time period. See id. Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) ("Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment."); Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir. 2011) ("[T]he ALJ [is] not required to adopt [the claimant's] unsupported subjective complaints and self-imposed limitations. Aside from her own testimony, there is no support in the record upon which to base a finding [claimant's] limitations include napping during the work day.").

In addition, the undersigned notes that the ALJ based his hypothetical question on medical evidence contained in the record as a whole. Giving consideration to the medical evidence as a whole, the ALJ limited Claimant to less than a full range of light work. Accordingly, Claimant's claim that the hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the RFC should be denied. This claim is without merit inasmuch as the hypothetical included those impairments the ALJ found credible. A proper hypothetical

must include only those impairments accepted as true by the ALJ. Pearsall, 274 F.3d at 1220. Furthermore, an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities." Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments "significantly restricted his ability to perform gainful employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as a hospital products assembler, a small parts assembler, and a plastic products inspector/packager with such jobs existing in significant numbers in the local and national economies. The vocational expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform less than a full range of light work. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id.

Claimant mischaracterizes Dr. Winkler's testimony in support of this alleged limitation. At the hearing, Dr. Winkler testified that the record contained records showing a normal range of motion in the neck , and he had at least 50% movement. Further, she considered Claimant's reduced range of motion in the cervical spine when formulating the RFC. Dr. Winkler opined nothing in the medical records suggested that there would be such a limited range of motion that

he would not be able use his neck, and the medical evidence did not warrant the finding that he could not tilt his head downward to look at a keyboard, desk, or bench.  Further, Dr. Winkler testified that although Claimant has some decreased range of motion, she did not see support in the record support showing he could not look with his eyes downward and his neck titled.  Dr. Winkler found the record supported some decreased range of motion turning his head side to side.  The ALJ is not required to include other limitations in the hypothetical that he found to be unsupported in the record.  Here, the ALJ properly included only those impairments and limitations he found to be supported by the evidence as a whole in his hypothetical to the vocational expert.  See Goff, 421 F.3d at 794; see also Pearsall, 274 F.3d at 1220 ("The ALJ's hypothetical properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit.").  The vocational expert considered a hypothetical question that fully accounted for Claimant's credible work-related limitations, his testimony that Claimant could perform work existing in significant numbers was substantial evidence in support of the ALJ's determination.  As a result, the ALJ's hypothetical to the vocational expert was proper.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    New Evidence Before the Appeals Council

Claimant obtained additional evidence, another independent medical examination from Dr. Musich completed on November 1, 2011 wherein he finds Claimant continued to suffer from cervical pain and restricted range of motion since his December 26, 2006 work-related injury after the ALJ issued his decision. (Tr. 1-5, 786-90). This examination, the May 2, 2012 Mental Residual Functional Questionnaire, and Sherry Browning's vocational analysis were submitted to the Appeals Council. The Appeals Council stated that it had considered the additional evidence and determined that it did not provide a basis for changing the ALJ's decision. (Tr. 1-5). The undersigned finds that, even in light of the new evidence, substantial evidence supports the ALJ's decision.

"An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application." Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.620(a), 416.330). The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). Additional evidence submitted to the Appeals Council is material when it is "relevant to the claimant's condition for the time period for which benefits were denied." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Cunningham, 222 F.3d at 500. This Court does not review the Appeal Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Cunningham, 222 F.3d at 500.

The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the additional evidence in question was not material. Aulston v. Astrue, 277 F. App'x 663, 664 (8th Cir. 2008) (citing Bergmann, 207 F.3d at 1069-70) (noting that whether additional evidence meets criteria of materiality is a question of law that courts review de novo).

"When the Appeals Council has considered new and material evidence and declined review, [the court] must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000). Further, remand to consider the new evidence is proper only where plaintiff demonstrates that the evidence "is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). New evidence is material where it is "'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (quoting Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997)).

Although the Appeals Council denied Claimant's request for review without comment, records reflect that the Appeals Council received the additional records; that it made them part of the record; that it considered these records; and that it concluded that these records did not provide a basis for changing the decision of the ALJ. Cf. Lamp v. Astrue, 531 F.3d 629, 632-33 (8th Cir. 2008) (remanding case in which it could not be discerned whether the Appeals Council considered only one letter in a particular exhibit or two).

After careful review, the Court concludes that the third independent medical examination submitted to the Appeals Council does not provide a basis to change the ALJ's determination. In

the November 1, 2011 examination, Dr. Musich reevaluated Claimant at counsel's request and noted he "reevaluated all the medical records identified in my initial IME report and obtained additional history from [Claimant]" and "there are no changes from that which is stated in my initial IME report of June 2008 and January 2011." (Tr. 786). Likewise, at the examination Claimant reported "he has never undergone any additional evaluation or treatment relative to his cervical spine following January 2011," the date of Dr. Musich's last independent medical examination. (Tr. 786).

Claimant fails demonstrates that the evidence is material. Contrary to Claimant's assertion, the third examination is duplicative and not probative of the relevant time period. Thus, the submitted evidence is cumulative of other evidence in the record, and the undersigned finds that substantial evidence supports the ALJ's determination.

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As

long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  9th  day of September, 2014.